UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x

7001 EAST 71ST STREET LLC,

                 Plaintiff,

         - against -

CHUBB CUSTOM INSURANCE
COMPANY,

               Defendant.
------------------------------------------------------- x

**OPINION AND ORDER**

13 CV 02898 (RJD) (SMG)

DEARIE, District Judge

This is an insurance coverage dispute between Plaintiff 7001 E. 71st Street, LLC ("7001"
or "Plaintiff") and Defendant Chubb Custom Insurance Company ("Chubb" or "Defendant").
Plaintiff owned a now-demolished single-story shopping center in the Bergen Beach
neighborhood of Brooklyn, New York and brought a claim pursuant to its insurance policy with
Chubb to recover for building loss and damage and business income losses sustained as a result
of Superstorm Sandy on October 29, 2012. The parties do not dispute that the building sustained
some amount of damage as a result of Superstorm Sandy, but dispute virtually everything else,
including (i) the extent of the damage, (ii) the location and nature of the damage in the building
and (iii) the cause of the damage—rainwater from above, which would be covered under the
Chubb policy, or flood, ground, surface water and sewage infiltration from below, which would
be excluded under the policy.

In sum and substance, Plaintiff claims the building sustained over $14 million in loss and
damage, principally the result of a wind-damaged roof, which allowed rainwater to enter the
building, damaging the building's main floor. The basement damage above the high-water mark,
Plaintiff claims, is attributable to rainwater leaking through the main floor as well as an electrical

fire. Plaintiff concedes that the basement damage *below* the high-water mark is attributable to flood and groundwater as well as sewer infiltration—all excluded losses under the Policy. Plaintiff also claims over $2 million in business income losses, which takes into account the hypothetical rent of each of the building's six units—including those that were not leased as of October 29, 2012—for all *seven years* that have elapsed since Superstorm Sandy. Defendant contends that building damage was limited primarily to the basement and was caused by surface, ground or flood water as well as sewage infiltration—all excluded losses. Any main floor damage, Chubb contends, likely pre-dated Sandy, but was in any event trivial at best and dramatically overstated in Plaintiff's case-in-chief.

## PROCEDURAL HISTORY

Plaintiff filed this breach of contract action on May 16, 2013. Following protracted discovery, Chubb moved for summary judgment, which this Court denied on September 29, 2017. At the same time, Plaintiff was involved in pending litigation against Continental Casualty Company ("Continental") related to an equipment damage insurance policy. In its 2017 Order denying Chubb's motion for summary judgment, the Court granted summary judgment for Continental, which Plaintiff appealed. In a summary order dated June 26, 2018, the Second Circuit reversed this Court's decision granting summary judgment for Continental.

On August 12, 2019, Plaintiff advised the Court that it had reach a settlement with Continental. The Court presided over a two-day bench trial against Chubb on September 9 and 10, 2019, during which the testimony and evidence proffered by each party revealed stark—at times almost irreconcilable—differences, telling a tale of two shopping centers. Plaintiff presented testimony from six witnesses—including 7001's principal, Lori Greenberg, the

2

building's roofing contractors, the contractor retained to estimate building repair costs, as well as engineering and environmental experts. Defendant also presented testimony from six witnesses, including Chubb's claims adjuster, a building tenant, the individuals hired to estimate repair costs and potential business income losses, and engineering experts. The Court, after reviewing the largely conflicting testimony, particularly with respect to each side's engineering experts, and considering (i) the quality and credibility of each party's witnesses, (ii) the photographs, reports and other exhibits in evidence, and (iii) the parties' post-trial submissions, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I.    Plaintiff and the Subject Premises

Plaintiff owns property located at 7001 East 71st Street in Brooklyn, New York. In 2012, the property was home to a single-story strip mall sub-divided into six rental units, including a medical office ("Maimonides"), which occupied approximately 50 percent of the space. A dry cleaner occupied another unit and a dance studio rented a third space. All three tenants paid rent on a monthly basis as well as a prorated share of the building's taxes and maintenance costs. As of October 29, 2012, the three remaining units were unoccupied and non-income producing. 7001 covered the taxes and maintenance costs associated with the unoccupied spaces. The mall was demolished in 2017.

The mall was covered by a 12,000 square foot flat roof constructed of a torched down modified bitumen membrane, which sat atop the building's original roof membrane, all of which were supported by wood planking. Drew Tr. 25:12-14; Quigley Tr. 327: 22-328:25. Plaintiff's witnesses—roofing contractors Tim Drew ("Drew") and John Martone ("Martone") of Martone & Sons Roofing, as well as Joel Silverman ("Silverman"), an engineering expert—initially

3

believed that metal decking supported the roof membrane. Drew Tr. 30:18-19; Martone Tr. 49:22-25; Silverman Tr. 139:16-140:10. However, defense engineering expert Martin Quigley ("Quigley") performed a comprehensive study and mapping of the roof and concluded the membrane was supported by wood planking, which was confirmed when the roofing was stripped off several years later. Silverman Tr. 139:16-140:10; Quigley Tr. 351:3-6. A parapet wall surrounded the membrane. Quigley Tr. 327: 22-328:25. To accommodate four centrally located drains, the roof was pitched one-quarter inch per foot toward the center. Id. The wood planking beneath the roof membrane sat above an interstitial space containing ductwork, insulation and some electrical components. Quigley Tr. 353:2-354:21. A tiled ceiling was installed below the interstitial space on the main floor of the building.

The building's exterior walls were comprised of brick veneer applied directly to concrete masonry unit ("CMU") backup walls. Quigley Tr. 358:17-19. Plaintiff's engineering expert, Joel Silverman, testified that the brick veneer was not applied directly to the CMU backup walls but that there was space between the brick and the CMU backup walls creating a "cavity" that "essentially runs from the parapet to the basement" and such that if he "put a hole in the wall and stuck [his] head in there, [he'd] be able to, with a flashlight, look up at the bottom of the parapet." Silverman Tr. 191:6-16, 198:4-20. However, because Silverman's conclusion was based on superficial observations and assumptions based on prior experience unrelated to this specific building, the Court instead credits the testimony of defense engineering expert, Martin Quigley, who performed invasive testing of the walls to determine their components. Quigley Tr. 358:4-19 ("Q: Did you do any invasive or destructive testing? A: We did on the outside— well, on the outside of that wall we removed a brick from the veneer, and on the inside—I forget

4

if we removed it or if it had already been removed—there was dry wall removed so we can see the interior face of the masonry wall").

The building's basement ranged between six and a half to eight feet in height. Electrical and plumbing fixtures lined the basement's ceiling and the basement itself housed "three or four" sump pumps—all of which were shut off during Superstorm Sandy, exacerbating the accumulation of water in the basement. Silverman Tr. 114-117. Finally, there was a parking lot adjacent to the building that sloped slightly toward the building's entranceway.

II.    The Policy

Chubb issued a first-party commercial property insurance policy ("the Policy") to 7001 effective October 2, 2012 through October 2, 2013. PX1. The Policy covers up to $3,000,000 in property loss or damage and up to $185,000 in business income losses, subject to a deductible and coinsurance requirement, and covers all losses unless specifically excluded or limited. Id. Business income losses are reimbursed up to the "the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration." Id. The Policy specifically excludes loss or damage caused "directly or indirectly" by "flood, surface water…[w]ater that backs up or overflows from a sewer, drain or sump…[w]ater under the ground surface pressing on, or flowing or seeping through (a) foundations, walls, floors or paved surfaces, (b) basements, whether paved or not; or (c) doors, windows or other openings." Id. An "anti-concurrent causation" ("ACC") provision appended to the "water" exclusion provided that loss or damage caused directly or indirectly by any of the excluded "water" losses would be "excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Id. However, if the water described above "results in fire, explosion or sprinkler leakage" the loss or damage "caused by the fire, explosion or sprinkler leakage" is covered. Id.

The Policy also excludes coverage for loss or damage resulting from the "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." Id. The Policy limits coverage to the extent damage to a building's interior is "caused by or result[s] from rain...whether driven by wind or not, unless...[t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain...enters." Id.

III.     Superstorm Sandy

a.  What Was Damaged and How It Was Damaged

On October 29, 2012, Superstorm Sandy made landfall in the New York City area. Con Edison shut off power to many of Brooklyn's southern-most neighborhoods bordering Jamaica Bay, including Bergen Beach, where 7001's one-story shopping center was located. Due to significant water entry in the basement, Con Edison refused to return power to the building immediately after the storm, and, in fact, the building never regained power. Greenberg Tr. 99:1-5; 148:5-13. In the meantime, the building's largest tenant, Maimonides Medical Center, hardwired a generator in an effort to continue operations in Sandy's wake. Greenberg Tr. 148:5-13. The building's two other tenants did not reopen for business following Sandy and there was thus no power in the building outside Maimonides Medical Center. In December 2012, 7001 evicted Maimonides from the premises and eventually sued Maimonides in New York state court for damages allegedly caused post-Sandy. Greenberg Tr. 156: 19-21.

i.  The Roof

Plaintiff's witnesses testified that prior to Sandy the roof was "properly adhered to the deck" and in "very good condition" without wrinkles or any significant wear and tear." Drew Tr. 6-8. Following Sandy, it was apparent there had been "a lot of movement on the roof," in the

6

form of "ripples" and "wrinkles" typically caused by wind entering beneath the roof membrane and causing "uplift" to the membrane. Drew Tr. 9, 14:7-11 (THE COURT: All right. So for the ripples to occur the wind or air pressure has to get somehow underneath [the membrane]. THE WITNESS: Yes. THE COURT: To separate it from the base. THE WITNESS: Exactly). Roofer Tim Drew explained that when he walked the roof within a week of Sandy he could "feel that...the roofing was loose," "wasn't adhered to the insulation," and had come loose in a few spots along the parapet walls. Drew Tr. 16. Drew also testified that he accessed the roof with a ladder because the building had no internal roof hatch. Drew Tr. 25.

Drew's boss, John Martone, did not personally walk the roof, but he testified based on his decades of experience as well as his review of Drew's photos and notes that the wind-driven ripples on the roof membrane split, causing at least "four or five" lacerations, and allowing rainwater to penetrate the interior of the building. Martone Tr. 40. This testimony is consistent with post-Sandy photographs revealing bubbling and rippling on the roof, peeling at the intersection of the membrane and parapet walls, and cement patches, installed by Drew, over what were mostly likely lacerations caused by Sandy-driven winds. See PX32-35, 40-41, 44-45, 48; Drew Tr. 29:5-14. Silverman, who did not walk the roof but testified that he was able to observe the roof through an internal roof hatch in the building, explained that the roof appeared to be in "significant distress" because the roof membrane had "pulled away" from the parapet walls and was "passing water vertically through many of the interior walls." Silverman Tr. 19-21. Silverman went on to testify repeatedly that the roof was "partially flooded," a "mess" and "ruined." Silverman Tr. 21-22.

However, Silverman's recollection of the roof as "a total mess" is undermined by the fact that the hatch through which he purportedly observed such catastrophic damage more than likely

7

did not exist.   Silverman claimed he viewed the roof with his head "chin high" through a hatch at the top of a stairway, but Drew, who had years of prior experience working on this particular roof, testified there was no roof hatch or stairway and that he had to use a ladder.   Compare Drew Tr. 24:23-25:7 with Silverman Tr. 124:20-125:12.   During deposition Chubb's counsel represented to Silverman that there was no hatch in the building.   Silverman rejected the representation. Silverman Tr. 124:20-125:12. The Court credits Drew's recollection of the roof, which is consistent with the available photographic evidence.   Moreover, though his testimony differs with respect to the *cause* of such damage, Drew's testimony regarding the *condition* of the roof is consistent with the testimony of Chubb's engineering expert, Martin Quigley, who testified that when he walked the roof he observed "numerous ridges, cracks and bubbles" as well as "ripples," and Chubb's damages witness Mark McGivern who also acknowledged the presence of "ripples and ridges" on the roof.  See, e.g., Quigley Tr. 327:24-328:1; McGivern Tr. 441:13-20.

Though Chubb acknowledges the roof showed some signs of distress, Chubb argues that Sandy's 80-to-90 mile per hour winds were not strong enough to create ripples or lacerations and hypothesizes that any such damage pre-dated Sandy as a result of improper adhesion of the "roof membrane...to the substrate below." Quigley Tr. 343:25-344:1. However, this suggestion ignores the fact that wind speed and direction can change depending on the surface the wind encounters and Chubb's 80-to-90 mile per hour estimate does not account for this phenomenon. Quigley Tr. 343:25-345:18; 385:3-389:8. And, any testimony attributing the membrane ripples to alternative causes of roof distress, such as insufficient membrane adhesion, are speculative and are not based on the witness's familiarity with 7001's roof or other evidence of record.  Indeed, none of Defendant's experts had occasion to walk the roof prior to Superstorm Sandy, whereas

Drew testified, based on his own personal pre-Sandy experience on the 7001 roof, that the membrane was properly adhered. Drew Tr. 7:6-16. Accordingly, the Court finds based on the credible testimony and photographic proof presented at trial that while the roof was not facing the *imminent* ruin Silverman described, the roof experienced significant wind-related distress as a result of Superstorm Sandy, causing the membrane to separate from the parapet walls and uplift in certain areas which created various ripples and wrinkles on the membrane. At least "four or five," if not more, of these ripples lacerated and allowed rainwater to penetrate the building's interior. Martone Tr. 40:2-5.

> ii. The Main Floor

Chubb's assertion that there was virtually no evidence of damage from Sandy to the first floor is not supported by the credible evidence adduced at trial, but neither is 7001's attempt to convince the Court that the main floor was completely "soaked" and "saturated" more than two weeks after the storm. Compare Silverman Tr. 23:17-25; 34:8-36:2 with Magnotta Tr. 254, 260-61 and Quigley Tr. 321-22, 403. The true measure of damage to the main floor attributable to Superstorm Sandy lies somewhere between these two extreme versions.

First, Quigley's roof composition analysis, which is unrefuted by Plaintiff's credible evidence, indicates that any water accumulation on the roof would likely encounter the original roof membrane, gypsum board, wood planking, insulation and an interstitial space with ductwork and piping, before making its way to the tile ceiling on the main floor. Quigley Tr. 353:2-354:21. Photographs taken of the building's interior shortly after Sandy revealed water staining on a number of ceiling tiles, indicating that at some point moisture seeped through the roof and interstitial space. See PX 39-40. Chubb does not dispute that some ceiling tiles were stained, but argues—in a familiar refrain—that the ceiling tile stains, like the roof ripples, *pre-dated* Sandy

because the amount of rain visited by the storm was not enough to cause the type of water infiltration capable of causing extensive ceiling damage. Defendant's attempt to focus the Court on the number of inches of rain in a vacuum—as measured by a weather station several miles away—obscures the cumulative impact of even a relatively insignificant number of inches of rain (here, approximately half an inch) on a 12,000 square foot wind-damaged roof. See, e.g., Silverman Tr. 146. Though Silverman calculated the approximate number of gallons of rainwater that descended on the roof based on an 18,000 square foot roof and two inches of rain, as opposed to a 12,000 square foot roof and a half an inch of rain, his calculations nevertheless reflect that well over one thousand gallons of rainwater fell on the roof. While some of this rainwater likely drained through one of the roof's four centrally-located drains, some rainwater penetrated the lacerations on the roof membrane. And, because the layers separating the roof membrane from the main floor ceiling tiles were not impervious, at least some rainwater, of the more than one thousand gallons that descended on the roof, more likely than not entered the interior of the building and stained the ceiling tiles.

This finding is consistent with the credible testimony presented by both parties. Maimonides hospital administrator and defense witness Tami Santora testified that when she returned to the premises about a week after Sandy some of the ceiling tiles had "minor stains" and some of the carpeting toward the building's entrance was "damp," but explained there was no evidence of water damage to the walls of the main floor and the desks, furniture and equipment appeared to be in working order. Santora Tr. 278-79.[1] Plaintiff's environmental expert Edward Olmstead also noted that he saw "a lot" of ceiling tiles that had succumbed to

---

[1] Though Santora noted the building had a history of prior leaks, she could only remember one, in approximately 2006, where she requested a repair, which was made. Santora Tr. 285. Drew confirmed that while he had made repairs to the 7001 roof before 2012, just prior to Sandy, the roof was stable.

excess moisture when he visited the premises two weeks after Sandy. Olmstead explained that his mold spore analysis of the main floor was more consistent with mold from rainwater, as opposed to sewage water. Olmstead's analysis makes it difficult to refute the notion that rainwater, in some capacity, entered the building from *above the ground*, resulting in mold growth on the building's main floor. Olmstead Tr. 78.

Second, although rainwater also seeped through tears in the roof's parapet walls, because the CMU backup walls were applied directly to the building exterior's brick veneer, any residual moisture in the building's exterior walls would more than likely be *de minimis*. This is consistent with Olmstead's moisture measurements, which revealed that most walls were "dry" with some slight moisture in just one of the unoccupied units. Olmstead Tr. 67-68.

Third, rainwater leaking through the roof likely does not account for all main floor damage. Testimony at trial indicated that surface water also infiltrated the main floor from the parking lot, which was slightly pitched toward the shopping center and "inundated with water." Osborn Tr. 296:16-20; Quigley Tr. 317:6-19. Santora Tr. 278:5-9; 279:18-21; Osborn Tr. 296:23-297:2; Quigley Tr. 317:6-19.

On the other hand, Silverman, who, like Olmstead also visited the premises about two weeks after Sandy, testified that the humidity in the building's interior was likely close to 100 percent, "the place was wet," "the ceilings were saturated" and "the floors were saturated," rendering the building "essentially uninhabitable." Silverman Tr. 40. Silverman opined that the rainwater from the roof was so voluminous and the exterior walls so porous, rainwater descended all the way through the building's interior, damaging not only the ceiling tiles and exterior walls but also the floor and it was unlikely that floor damage was attributable to the infiltration of parking lot surface water.

11

Though there is some credible evidence of water penetration on the building's ceiling tiles and exterior walls, Silverman's testimony that the main floor was "soaked" and "saturated" is refuted by both Santora—a layperson with no connection to either party—and Olmstead—*Plaintiff's* own witness. To that end, the Court does not adopt Silverman's characterization of the premises as a "steam room" in its entirety. Santora characterized the building as relatively dry a week after Sandy, while noting some wet areas toward the parking lot as well as stained ceiling tiles. Santora's observations are consistent with Olmstead's analysis, which concluded that while there was above-average mold growth on the main floor indicative of external water entry, moisture measurements of the exterior walls revealed the main floor was relatively dry with only "slight moisture" in one building unit. Olmstead Tr. 67. Therefore, based on the credible evidence and photographic records presented at trial the Court finds that (i) rainwater seeped through lacerations in the roof membrane staining the main floor's ceiling tiles, (ii) rainwater also seeped through splits in the roof's parapet walls, but ultimately left only residual amounts of moisture in the building's exterior walls, which, absent any effort to dry out the walls, contributed to mold growth on the main floor, and (iii) damage to the floor is primarily attributable to surface water from the parking lot, not rainwater from the roof.

Finally, the efflorescence[2] observed on the building's façade cannot be wholly attributed to rainwater from Superstorm Sandy and it is impossible to tell the extent to which efflorescence occurred as a result of Sandy or pre-dated Sandy. For example, the 2011 Google Street view images in DX125-8, clearly show signs of pre-Sandy efflorescence.[3] Moreover, whereas

---

[2] Efflorescence is a crystalline salt deposit that accumulates on the surface of concrete and brick when water leaves behind salt.

[3] Though Chubb similarly argues, also based on a series of Google images, that roof damage pre-dated Sandy, the signs of efflorescence pre-Sandy are far more distinctive that any signs of rippling on the roof membrane pre-Sandy.

witnesses testified regarding the state of the *roof* pre-Sandy, there was no testimony presented at trial regarding the appearance of the building's façade pre-Sandy which would allow the Court to meaningfully distinguish between pre- and post-Sandy efflorescence. Accordingly, the Court cannot conclude that rainwater penetration from Superstorm Sandy caused efflorescence on the building's granite façade.

### iii. The Basement

It is undisputed that the basement damage below the high-water mark was caused, at least initially, by water flow not covered under the relevant policy, including surface, flood and ground water as well as sewage infiltration. Plaintiff submits, however, that damage above the high-water mark was caused by rainwater continuing to seep through the main floor and the building's exterior walls and into the basement. However, to the extent the damage above the high-water mark was caused by surface, ground or floodwater, Plaintiff argues this water infiltration started an electrical fire in the basement, which should be covered pursuant to the "fire or explosion" exception to the Policy's "water" exclusion. Defendant contends that there is no evidence of electrical fire, only electrical "arcing," an "electrical disturbance" which is not the same as a fire and thus not covered by the "fire or explosion" exception to the "water" exclusion. Magnotta Tr. 265-66. Plaintiff introduced no evidence to suggest that there was an actual fire, as opposed to arcing, and thus, to the extent the water above the high-water mark was attributable to surface, flood or groundwater infiltration, such water did not cause a "fire or explosion" for purposes of the exception to the "water" exclusion.

Defendant's witnesses also testified that the water damage to the walls above the high-water mark was due to moisture wicking up the wall from below the high-water mark as well as surface water from the parking lot seeping through to the basement ceiling. On the other hand,

Silverman testified that any water damage in the basement above the high-water mark was attributable to rainwater that had managed to seep through the roof and the main floor. Because the Court does not credit Silverman's testimony that the main floor was "soaked" and "saturated," it seems unlikely that water damage in the basement above the high-water mark was exclusively caused by rainwater. On the other hand, and as discussed above, the Court credits Santora and Quigley's testimony and finds that because the parking lot sloped toward the building, and FEMA flood maps revealed the parking lot was "completely inundated," the accumulation of water on the floor of the main level, which penetrated the basement ceiling, was more than likely surface water from the parking lot. Santora Tr. 278:5-9; 279:18-21; Osborn Tr. 296:23-297:2; Quigley Tr. 317:6-19. Therefore, water damage both above and below the high-water mark in the basement was caused by a combination of surface, ground and floodwater as well as sewage infiltration.

  b.  Damages

    i.  Cost to Repair Building Damage Caused by Superstorm Sandy

As described above, Superstorm Sandy created ripples and wrinkles on the roof membrane, some of which lacerated and allowed rainwater to seep through, staining the main floor ceiling tiles and contributing to mold growth on the main floor.[4] To assess the cost of this, and other damage, Plaintiff retained contractor Mario Alvarez of Precision Construction Enterprises. Alvarez walked through the building on three separate occasions—December 19 and 21, 2012 and January 7, 2013. According to Alvarez, he took some notes and then reached out to subcontractors and tradesmen for a cost estimate. Alvarez Tr. 172, 198. Alvarez did not

---

[4] Because the Court finds that all other building damage can be attributed to surface, ground or floodwater as well as sewer infiltration, the Court will not assess the cost to repair such damage. As discussed further below, such loss or damage is excluded under the Chubb policy.

take any photographs during his walk throughs and testified that if the subcontractor needed more information to formulate an estimate Alvarez would return to the building to obtain the requisite information. Id. Alvarez did not save the notes from his walk-throughs or from his phone calls with subcontractors, nor did he conduct his walk throughs with a building blueprint. Alvarez Tr. 172, 199. Furthermore, Alvarez could not recall the vast majority of the names or companies of the subcontractors he contacted for estimates or the substance of those conversations. Alvarez Tr. 201. Alvarez's only support for his damages estimate is a five-page bullet point document listing the category of repair, a vague description, e.g., "Electrical: wiring, power, panels," and a price. Alvarez estimated roof repairs in the amount of $370,000—$50,000 more than the estimate initially provided by Plaintiff's roofing contractor Martone & Sons—and main floor repairs totaling $4,200,000. PX2-8. According to Alvarez's estimate, Plaintiff would also need to spend $60,000 to repair the building's granite façade and $615,000 to repair unspecified electrical equipment. This $615,00 is on top of the $2,275,000 Plaintiff already seeks to repair nonelectrical basement damage, even though such damage is ultimately not covered by the Chubb policy. Id.

Defendant retained Mark McGivern, the CEO and cofounder of Construction Consulting Associates ("CCA"), to conduct a damages assessment of the premises. McGivern is a trained and experienced user of the Xactimate software suite—a construction estimating program developed almost thirty years ago, capable of generating construction estimates based on aggregated geographical pricing data and updated quarterly. McGivern testified that he has priced hundreds of building projects, including many rebuilding efforts following major natural disasters such as Hurricanes Andrew, Irma and Maria. McGivern Tr. 420. McGivern explained that his company performs construction pricing for a number of different entities using

Xactimate, including, but not limited to, insurance companies. McGivern provided his damages estimate as part of a comprehensive 32-page report, which also included 16 exhibits and additional backup for his analysis. McGivern estimated it would cost $1,522,748—less than a quarter of Alvarez's estimate—to replace the roof and the entire main floor.

McGivern's testimony and the information he used to form his pricing estimate give the Court considerably more confidence than the estimates generated by Alvarez, which come without any meaningful assurances of reliability. The Court will therefore apply McGivern's pricing in assessing the following loss and damage:

- $12,028.26 to repair wind-damaged outdoor signage. DX124.

- $13,179.99 to repair the main floor, which accounts primarily for removing and replacing ceiling tiles. DX124.

- $177,314 to remove and replace the roof. DX124.

The Court does not adopt McGivern's pricing for electrical and basement damage because, as explained below, such damage is not covered under the Chubb policy. Moreover, because some, if not all, of the granite façade's efflorescence pre-dated Sandy, and it is impossible to tell what portion of the efflorescence was caused by Sandy, the Court will not allocate damages to replace the granite façade. Finally, with respect to the remaining alleged main floor damage, not only did Plaintiff's environmental expert reject the suggestion that the first floor "get gutted" because water infiltration rendered it unsalvageable, but the credible evidence adduced at trial revealed that, within two weeks of Sandy, there was, at most, only residual moisture in the building's main floor contributing to mold growth, but it was not the "steam room" Silverman hyperbolically described. Olmstead Tr. 87:19-25; Silverman Tr. 44:18-45:8. In any event, Plaintiff made no attempt to dry out the rest of the building or otherwise

prevent additional water infiltration and mold growth on the first floor. Had Plaintiff attempted to remediate mold growth in the first few weeks after Sandy, it is likely that much of the mold damage would have been mitigated, if not entirely avoided.

ii. Building Demolition and Business Income Losses

Plaintiff also seeks business income losses principally in the form of lost rent payments from the building's three tenants as well as expected rent from three hypothetical tenants who, according to Ms. Greenberg, were on the verge of renting out space in the building just before Superstorm Sandy. Greenberg Tr. 111:13-21, 117:13-25. Plaintiff deducted from the building's total annual income, among other things, 30 percent of the building's total real estate taxes (70 percent of the real estate taxes were prorated among the building's three tenants) and $24,000 for insurance. Ultimately, Plaintiff estimated total monthly business income losses at $30,673.33, or $270,532.44 on an annual basis, which Plaintiff argues has resulted in at least $2,545,886.89 in net business income loss for the seven years since Superstorm Sandy. Plaintiff contends it is entitled to business income losses for this entire period because Ms. Greenberg always had the intent to reopen the building as soon as practicable and only demolished the building when forced to do so. Greenberg Tr. 120:8-25 (Q: Did there come a time when...you thought that you might not be able to fix [the building], that you might decide to tear it down? A: I had to because I was getting multiple calls from the neighborhood, multiple violations...[P]eople calling the department of health on me....There was no hope). Chubb, on the other hand, submits Plaintiff developed the intent to demolish early on, which should foreclose her from recovering business income losses.

The Court is not persuaded that Plaintiff only developed the intent to demolish the building *years* after Sandy. To the contrary, Santora's testimony that Ms. Greenberg told her

within weeks of Sandy that the building would be demolished is more credible than Ms. Greenberg's own self-serving testimony that she *always* had the intent to reopen the building. And, Ms. Greenberg's testimony is belied by the fact that she did not undertake remediation efforts to dry out the building or stop mold growth, even after receiving a quote for mold remediation and even though she likely had the funds to pay for such remediation out of pocket. Greenberg Tr. 131:2-133:22; DX20. The credible evidence adduced at trial indicates that while Ms. Greenberg may not have formed the intent to demolish the building *immediately* after Sandy, she did so shortly thereafter, and more likely than not by early 2013.

Next, Defendant contends that to the extent Plaintiff is entitled to business income losses, they are (i) less than Plaintiff claims on a monthly basis and (ii) should not exceed ten weeks— the period of time it would have taken to restore the premises to its pre-Sandy condition. The primary difference in monthly business income losses between Plaintiff and Defendant is attributable to rent income for the three unleased stores in the building. Whereas Plaintiff argues those spaces would have been quickly leased but for Superstorm Sandy, Plaintiff does not provide any documentation to support this contention—draft or final lease agreements, memoranda of understanding, email communications with prospective tenants, or otherwise— and rests only on the self-serving testimony of Ms. Greenberg. Greenberg Tr. 111:13-21, 117:13-25 ("[A] lot of our stuff was on a handshake"). Plaintiff does not even specifically identify the tenants with whom she had apparently discussed leasing options. Greenberg Tr. 117:22-25. The Court agrees that to the extent business income losses are available under the policy, they should not take into account the rent attributable to the unleased stores. And, because Ms. Greenberg may have contemplated the possibility of demolition early on, but did

not make this decision *immediately* after Sandy, Plaintiff will be entitled to business income losses only throughout the period of restoration, as set forth in the Chubb policy.

To calculate business income losses for the period of restoration, Plaintiff includes several line items that Chubb's accounting expert, Glenn Silver, concluded were unsupported. DX 118. These line items include (i) income from the tenants' share of street lighting expenses ($104.17 monthly), (ii) legal fees in challenging assessed valuation of the premises ($25 monthly) and (iii) water and sewer charges ($287.05 monthly). Id. Silver opined that Plaintiff's estimated expenses were overstated, producing a total net income that was actually too low. For example, Silver did not include loss-related expenses in calculating monthly expenses and generally resolved all issues or discrepancies in calculating total net income to the Plaintiff's benefit. Id.; Silver Tr. 485:5-14, 487:14-20. Ultimately, the analysis provided by Silver more accurately captures Plaintiff's total net income for the relevant restoration period—it omits rent for unleased stores and reconciles expenses and income that were already paid for or received for all of 2012, but that would reoccur at some point in 2013. The Court adopts Silver's business income loss calculation for the ten-week restoration period of $36,098.87.

## CONCLUSIONS OF LAW

I.    Covered Losses and Failure to Remediate

A breach of contract occurs where the plaintiff establishes by a preponderance of the evidence (i) the existence of an agreement, (ii) performance by the plaintiff, (iii) breach of contract by the defendant, and (iv) resulting damage. Saggio v. Select Portfolio Servicing, Inc., 2015 WL 6760132 (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004)). It is undisputed that a valid insurance agreement existed between 7001 and Chubb and that 7001 paid the premium due on the policy. The issues are therefore

whether Chubb breached the agreement by failing to compensate 7001 for loss covered by the policy, and if so, the damage owed. The Court concluded that the building sustained damage attributable to Superstorm Sandy on the roof, the outdoor signage and ceiling tiles on the main floor. Next, whereas damage to the ceiling tiles and exterior walls can be attributed to rainwater, any rainwater that penetrated the building's exterior walls left residual moisture, at best, and thus the resulting mold growth could have been prevented through efforts to dry out the building. Finally, the rest of the damage in the building was attributable to surface, ground or floodwater as well as sewage infiltration.

Applying the Policy's relevant coverage provisions to the factual findings detailed above, the Court concludes that:

- Roof damage caused by wind is covered by the policy and not subject to any exclusions or limitations. PX1.

- Staining of the main floor ceiling tiles is covered by policy because although the policy does not cover damage to "the interior of any building...caused by or resulting from rain...whether driven by wind or not" there is an exception for coverage where "[t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain...enters." PX1. Here, the building first sustained wind-driven damage to the roof, which then caused rain to enter into the interior of the building.

- Damage to the floor and basement of the building is not covered because such damage was caused by "flood, surface water...water that backs up or overflows from a sewer, drain or sump; or.... water under the ground surface," all of which are excluded losses under the policy. And, because such water infiltration at most

20

caused electrical arcing, not an electrical fire, the "fire or explosion" exception to the "water" exclusion is inapplicable.

- Water damage to the building's walls and mold growth caused by the residual moisture on the first floor is not covered because it resulted from the "continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." Though the Court finds that the above-average presence of mold spores on the main floor was attributable to rainwater and moisture seeping through the roof's parapet walls and through the building's exterior walls, the Court also finds that within two weeks of Sandy the moisture had subsided and Plaintiff had made no attempt to dry out the walls or remediate mold growth. Accordingly, the main floor sustained damage attributable to the "continuous…seepage or leakage of water…over a period of 14 days or more." Particularly because testimony revealed that attempts to dry out the walls promptly would have contained or even eliminated the damage, the persistence of such mold and the cost to repair the main floor as a result of such mold damage is not covered under the policy.

Plaintiff has thus proven by a preponderance of the evidence that Chubb breached the terms of the insurance policy by denying coverage for loss or damage to the building's roof, main floor and outside signage.

II.    Impact of the Continental Settlement

Though Plaintiff is entitled to recover for roof damage, sign damage, ceiling tile damage and business income losses through the period of restoration, the Court must reduce Plaintiff's recovery to the extent it would be duplicative of what Plaintiff recovered in its settlement with

Continental, which was disclosed to the Court *in camera*. Indeed, "[w]hen a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent *common damages*." Allstate Ins. Co. v. Yehudian, 2018 WL 1767873, at *18 (E.D.N.Y. Feb. 15, 2018) (emphasis added) (quoting Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989)). In other words, the nonsettling defendant receives a "set-off" or credit of the full settlement amount with respect to the nonsettling defendant's damages owed. Id.; see also Gerber v. MTC Electronic Techs. Co., Ltd., 329 F.3d 297, 303 n.2 (2d Cir. 2003).

Without addressing the "set-off" principle directly, Plaintiff agrees that its recovery should be apportioned, though not credited entirely, to the extent "overlapping risk is covered under two or more insurance policies which have substantially identical excess insurance clauses" so that the clauses "cancel out each other and each insurer contributes in proportion to its limit amount of insurance." Phila Indem. Ins. Co. v. Empire Ins. Co., 318 F. Supp. 2d 170, 172 (S.D.N.Y. 2004). To that end, Plaintiff explains that because the Chubb policy provided $3,000,000 of coverage and the Continental policy provided $5,000,000 of coverage, Chubb is responsible for 37.5 percent of the damage that is covered under both policies.[5]

These principles are inapplicable to this case because there are no "common damages." Though the policies cover some of the "same risk," because the Continental policy, and subsequent settlement, does not cover the loss and damage this Court finds covered under the Chubb policy, the Chubb damages award need not be reduced to account for the Continental

---

[5] The apportionment is calculated by taking the total amount of insurance coverage—$8,000,000—and determining the percentage of that coverage supplied by the Chubb insurance policy—$3,000,000 or 37.5 percent of $8,000,000.

settlement. There being no "common damages" between Chubb and Continental, no "set-off" or credit is warranted.

## CONCLUSION

The Court finds for the Plaintiff insofar as Chubb breached its insurance contract with 7001 by failing to provide coverage to repair the roof, outdoor signage and main floor ceiling tiles. Accordingly, Chubb owes 7001 damages in the amount of $202,522.25, less the $25,000 deductible and plus pre-judgment interest, as well as business income losses of $36,099 plus pre-judgment interest.

SO ORDERED.

Dated: Brooklyn, New York
       October 18 2019

                                        s/ Raymond J. Dearie
                                        RAYMOND J. DEARIE
                                        United States District Judge